incurred in testing and repairing defective TVPCs.[13]

 As far as the contract inventory issue is concerned, the trial court found that [a]t the time of issuance of the government claims and as late as the time of filing the complaint, the manufacturing materials in question were not in the government's possession or control.... Events subsequent to the claim and the complaint cannot add to the jurisdiction defined by the claims appealed.... [U]nder the present circumstances, the court has before it only the government's demand for unliquidated progress payments, offset by accepted product. Accordingly, there is no occasion for the court to deal with the question of title to the manufacturing materials.

*Daff*, 31 Fed.Cl. at 696–97. Thus, the court did not offset against its award of unliquidated progress payments to the government the value of any manufacturing materials purportedly in the government's possession. This was not error. The default clause incorporated into the contract required that "[t]he Contractor and the Contracting Officer shall agree on the amount of payment for manufacturing materials delivered and accepted and for the protection and preservation of the property. Failure to agree will be a dispute under the Disputes Clause." FAR § 52.249–8(f), 48 C.F.R. § 52.249–8. Before the value of any inventory in the government's possession could be offset against the award to the government of unliquidated progress payments, Triad had to submit a claim to the contracting officer to that effect. *See Joseph Morton Co. v. United States,* 757 F.2d 1273, 1280 (Fed.Cir.1985) (claims "not inextricably linked with liability for fraud[ ] must first be the 'subject of a decision by a contracting officer'") (citing 41 U.S.C. § 605(a)). Because Triad had not submitted such a claim, the trial court was correct in concluding that it had no jurisdiction to decide the issue of the value of the inventory materials in the government's possession and then offset that value against the progress payments award.

13. The government presented bookkeeping records and the testimony of a maintenance management specialist to establish the sum expended

## CONCLUSION

Because the contracting officer terminated the TVPC contract based upon Triad's alleged failure to provide goods complying with the requirements of the contract, the Court of Federal Claims had jurisdiction with respect to Triad's challenge to the default termination, Triad's claim for convenience termination costs, and the government's counterclaims. As far as the merits are concerned, neither the finding of the trial court that Triad committed fraud nor the trial court's monetary award in favor of the government is clearly erroneous or tainted by legal error. We therefore affirm the judgment of the Court of Federal Claims in all respects.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

**HOECHST CELANESE CORPORATION,**
**Plaintiff–Appellee,**

v.

**BP CHEMICALS LIMITED and Sterling**
**Chemicals, Inc., Defendants–**
**Appellants.**

No. 94–1472.

United States Court of Appeals,
Federal Circuit.

March 19, 1996.

by the government in repairing the TVPCs. 31 Fed.Cl. at 695.

John F. Lynch, Arnold, White & Durkee, Houston, Texas, argued for plaintiff-appellee. With him on the brief were Michael Macklin, Melinda L. Patterson, Richard L. Stanley and Russell L. Sandidge. Also on the brief were Kenneth A. Genoni, Hoechst Celanese Corporation, Somerville, New Jersey, and Michael W. Ferrell, Hoechst Celanese Corporation, Summit, New Jersey. Of counsel were Stephen D. Dellett and Stephen E. Edwards.

Clyde F. Willian, Willian Brinks Hofer Gilson & Lione, Chicago, Illinois, argued for defendants-appellants. With him on the brief were Jack C. Beringweig, Cynthia A.

Homan, Richard A. Kaplan and Dominic P. Zanfardino. Also on the brief were Harold Haidt and G.T. Delahunty, Brooks Haidt Haffner & Delahunty, New York City, and Robins C. Gibbs and John Christopher Reynolds, Gibbs & Bruns, L.L.P., Houston, Texas.

Before PAULINE NEWMAN, CLEVENGER, and RADER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

BP Chemicals Limited and Sterling Chemicals, Inc. (together "BP") appeal the judgment of the United States District Court for the Southern District of Texas,[1] entered on the jury verdict that BP had infringed, willfully, United States Patent No. 4,615,806 (the '806 patent) owned by Hoechst Celanese Corporation (herein "Celanese"). On re-determination of the issues of claim interpretation, as mandated by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.) (*en banc*), *cert. granted*, —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995), and on review of the other issues on appeal, the judgment is affirmed.

## I

## INFRINGEMENT

### A. The Invention

The '806 patent, inventor Dr. Charles B. Hilton, is directed to a method of reducing iodide contamination in organic medium, particularly acetic acid. When the acetic acid is catalytically converted to vinyl acetate, the presence of iodide in more than about one part per billion poisons the catalyst. Such iodide contamination was known to be removable by contacting the acetic acid with silver-charged gel ion exchange resins, but the process was slow and impractical in large commercial volume. In seeking to improve the Celanese commercial process, Dr. Hilton discovered that by using a macroreticulated (sometimes described as macroporous) silver-charged cation exchange resin having specified characteristics, he obtained effective, rapid, large-volume removal of minute traces

---

1. *Hoechst Celanese Corp. v. BP Chemicals, Ltd.,* 846 F.Supp. 542, 31 USPQ2d 1825 (S.D.Tex. 1994).

of iodine, to a degree of effectiveness, practicality, and utility not previously available.

When BP encountered iodide contamination in the commercial production of acetic acid BP sought other methods of removal before adopting the method, using a macroreticulated silver-charged cation exchange resin, that is charged with infringement. Celanese brought suit, asserting that the BP method infringed claims 2 and 6 of the '806 patent. Claim 2 is shown, with claim 1 from which it depends:

> 1. A method for removing iodide compounds from a non-aqueous organic medium comprising contacting the medium containing said iodide compounds with an ion exchange resin characterized in that the resin is a macroreticulated strong-acid cation exchange resin which is stable in the organic medium and has at least one percent of its active sites converted to the silver or mercury form.
>
> 2. The method of claim 1 wherein the non-aqueous organic medium is acetic acid and from about 25 to about 75 percent of the active sites are in the silver form.

The question of infringement turns on the meaning of the word "stable" in the claims. It is no longer disputed that all of the other claim elements and limitations are present in the BP method.

### B. Review Procedure

Trial was to a jury, lasting for seven days. The jury found that the '806 patent was infringed and that the infringement was willful. The district court, denying duly made motions for a new trial and for judgment as a matter of law, entered judgment on the jury verdict. In its opinion the court identified the evidence in support of the jury verdict, identified the evidence supporting each party's theory of the meaning of certain disputed terms in the patent, and stated its own view of the meaning of these terms. In following this procedure the court relied on *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822 n. 3, 23 USPQ2d 1426, 1432 n. 3 (Fed.Cir. 1992), as requiring or advising that a judicial statement be made of the meaning of disputed claim terms.

■ BP points out that *Read v. Portec* has been superseded by the decision in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 34 USPQ2d 1321 (Fed.Cir.) (*en banc*), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995), and that *Markman* requires the Federal Circuit to decide *de novo* disputed questions of claim interpretation without deference to the trier of fact. BP points out that the disputed question of the meaning of the claim term "stable" is dispositive of the issue of infringement, and therefore that no deference need be given to the jury's finding of infringement. We agree that *Markman* so requires, and that the issue of infringement is decided by the meaning of "stable" as used in the claims. *See Markman,* 52 F.3d at 999, 34 USPQ2d at 1346 (Pauline Newman, J., dissenting) (pointing out that the disputed meaning of technical terms often decides the fact of infringement).

"Stable" is defined in the body of the specification as turning on the meaning of "dimension." Although "dimension" appears in the specification, not in the claims, implementation of the *Markman* decision appears to require that the meaning of "dimension" be given the same *de novo* determination by the Federal Circuit as the meaning of "stable" in the claims, lest we add further complexities to the trial of patent cases.

### C. Construction of the Terms "Stable" and "Dimension"

■ A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579, 6 USPQ2d 1557, 1560 (Fed.Cir.1988); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed. Cir.1992).

The meaning of "stable" as used in the claims is defined in the specification, col. 4, lines 31–35, as follows:

> By the term "stable," it is meant that the resin will not chemically decompose, or change more than about 50 percent of its

dry physical dimension upon being exposed to the organic medium containing the iodide compounds.

Thus the meaning of "stable" depends on the meaning of "dry physical dimension." On the BP position that "dry physical dimension" refers to volume, the BP process does not infringe; but on the Celanese position that "dimension" is a linear measure, there is literal infringement. Celanese states that linear dimension is the plain meaning of "dimension" as understood by persons of skill in this field and as used by the inventor. The BP position is that the term "stable" refers to volume as the physical dimension being measured, pointing out that the resin is in the shape of spherical beads and that the inventor in his research measured volume change. BP states that since its resin changes by more than 50% in volume when exposed to acetic acid, there can not be infringement.

■ The parties have provided us with photographs and experimental data, the testimony of the scientists who produced the data and interpreted it, and the testimony of experts in the field. *Markman* limits appellate reliance on extrinsic evidence to evidence in explanation of the technology and technical terms:

> Through this process of construing claims by, among other things, using certain extrinsic evidence that the court finds helpful and rejecting other evidence as unhelpful, and resolving disputes *en route* to pronouncing the meaning of claim language as a matter of law based on the patent documents themselves, the court is not crediting certain evidence over other evidence or making factual evidentiary findings. Rather, the court is looking to the extrinsic evidence to assist in its construction of the written document, a task it is required to perform.

52 F.3d at 981, 34 USPQ2d at 1331. However, we have found it necessary to rely on the evidence presented at the trial and credit certain evidence over other evidence, for we are not personally qualified to know the scientific meanings of "stable" and "dimension" as applied to macroreticulated cation-exchange resins in organic medium.

The evidence was sharply in conflict. The technical expert presented by Celanese testified as follows:

Q. The second part of this has to do with its dimension. What does that mean?

A. For the case of a spherical resin, it typically means its diameter.

Q. The word "dimension," does it mean volume dimension?

A. There is no such thing as volume dimension.

In turn, the BP expert testified that "dimension" meant volume dimension, stating that volume is what one skilled in the art would understand the term to mean:

Q. Okay. Is that all the reasons [why you believe the term "stable" refers to volume]?

A. There are at least two, perhaps three, additional very important reasons. One is that really it is the common practice of measuring changes that a resin experiences as it swells in a solvent in terms of volume percentage swelling. That is very amply documented in the literature. It is the easiest thing to do. Conversely, it is rather difficult to pick a single bead, measure the change in diameter of that bead, for example, because not every one bead in a sample of resin is identical to the rest of the beads. . . .

. . . .

The other rather important reason is that it is clearly the objective of this patent to distinguish between a resin that works because it has a porosity independent of swelling, such as Amberlyst 15, and another type of resin which has a porosity that depends upon swelling. That would be the gel type resin in the language used by the patent.

■ Both sides cite dictionary definitions that support their respective positions. *Webster's Ninth New Collegiate Dictionary* at 355 (1988) defines "dimension" as:

> measure in one direction; *specif.* one of three coordinates determining a position in space or four coordinates determining a position in space and time.

In partial contrast, the *Concise Oxford Dictionary of Current English* at 327 (8th ed.1990) defines "dimension" as:

> a measurable extent of any kind, as length, breadth, depth, area, and volume.

This court has occasionally relied on general and technical dictionaries to determine the meaning of technical and other terms. In this case the dictionaries do not distinguish in a dispositive manner between the contested technical meanings. Further, a general dictionary definition is secondary to the specific meaning of a technical term as it is used and understood in a particular technical field. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563, 15 USPQ2d 1039, 1043–44 (Fed.Cir.1990), *cert. dismissed,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). Thus we return to the testimony at trial.

■ Dr. Hilton, the inventor, testified under direct examination as follows:

Q. What is meant by that sentence? In other words, how much swelling does that definition of stable accommodate?

A. A 50 percent change in dimension. The dimension is a distance. A dimension is not volume. Okay? It's the distance between my hands, or it's the distance across my chest. It's the radius of a sphere. A dimensional change in a spherical particle of 50 percent would lead to a swelling or a volume increase of 337 percent.

Dr. Hilton was challenged as to his assertion that "dimension" means distance or linear dimension, for he had measured the swelling volume of these resins during his research. The following exchange occurred on cross-examination:

Q. When did you first form a view that dimension means something other than volume dimension, dimension in this definition of stable?

A. I have never thought of volume as being a dimension. Dimension is not—volume is not a dimension. Volume of a sphere formula, four thirds pi, distance cubed, radius cubed, distance times distance times distance. Dimension is a distance.

Q. You've never heard the term "volume" used as a dimension?

A. No.

Q. Yet you consider the volume expansion in order to design a guard bed, do you not?

A. Yes, you do.

Q. How many dimensions does volume have?

A. Volume has three dimensions.

The district court called Dr. Hilton's testimony "highly credible." Although we are at a disadvantage in attempting to make credibility determinations, the inventor's testimony reads as that of an expert in the field. *See Palumbo v. Don–Joy Co.*, 762 F.2d 969, 976, 226 USPQ 5, 9 (Fed.Cir.1985) (concluding that particular inventor's declaration as to claim meaning was by a "knowledgeable declarant"), *overruled on other grounds, Markman,* 52 F.3d at 979, 34 USPQ2d at 1329. *Markman* requires us to give no deference to the testimony of the inventor about the meaning of the claims. *Id.* at 983, 52 F.3d 967, 34 USPQ2d at 1332. However, we have treated Dr. Hilton's testimony as cumulative to the other evidence, and as enlarging our understanding of the technology and the usage of the disputed terms.

In addition, the specification of the '806 patent shows the resin characteristic of mesh size of the dry resin, a linear measure based on diameter. The specification also contains swelling data stated to be from the Technical Bulletin for Amberlyst® 15 and which, according to the inventor's testimony, is the percentage of swelling by volume. A videotaped "swelling test" that was presented to the jury is stated to have shown that Celanese's preferred Amberlyst® 15 resin expanded slightly more than 50% by volume in acetic acid, while BP's Purolite® resin of the same chemical composition (polystyrene cross-linked with divinylbenzene) expanded 103% by volume but less than 50% in linear dimension upon exposure to acetic acid.

The district court observed that BP's interpretation of "stable" as meaning dimension by volume would exclude from the claims the Celanese preferred embodiment that is described in the specification. How-

ever, if stable is measured by linear dimension, the claims include the resin that Celanese specifies in its invention. We share the district court's view that it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way. *See Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1550, 37 USPQ2d 1609, 1612 (Fed.Cir.1996) (claim interpretation that would exclude the inventor's device is rarely the correct interpretation).

■■■ We find that the more reasonable explanation is that volume has three dimensions, and we give weight to the argument that on the BP definition the Celanese preferred embodiment would not be within the claims of the Celanese patent. Thus we conclude that "dry physical dimension" as used in the specification means linear dimension. On this definition of dimension, and defining "stable" accordingly, the claims read literally on the BP process.

#### D. The Issues of Equivalency

Since this case was tried before *Markman* was decided, the jury was instructed to interpret these disputed terms en route to its verdict on the issue of infringement. We thus turn to the jury trial, in the interest of complete review at this time.

BP argues that a new trial is required because the jury was not asked to distinguish between literal infringement and infringement by equivalency. BP states that because it is possible that the jury relied on an inapplicable theory of infringement, the verdict must be discarded.

■■■ Celanese had proposed the submission to the jury of separate questions on literal infringement and infringement by equivalency, while BP did not propose separate questions. The judge selected the BP form of verdict. The specificity of the verdict is within the discretion of the trial judge. *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1561, 5 USPQ2d 1769, 1773 (Fed. Cir.) ("District courts have broad discretion in the conduct of jury trials, including the form of the jury verdict."), *cert. denied,* 488

U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). BP concedes that it had proposed the form of the verdict that was used, and states that the reason it did not propose a separate question on equivalency was because of its position that equivalency was an equitable matter and not for the jury. However, BP was fully apprised that the jury was instructed on infringement by equivalency, and that the issue had been presented by witnesses at trial. Further, BP's position was not the law at the time of trial, nor is it now. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995) (*en banc* ).

■■■ BP by its acquiescence in and indeed by its proposal of the verdict form waived objection to the verdict form. *See* Fed. R.Civ.P. 51; *Allen Organ,* 839 F.2d at 1562, 5 USPQ2d at 1774 (applying the general rule that a party will be deemed to have waived objection to possible inconsistencies in the jury verdict if it failed to raise such objection before the jury was discharged); *Matthews v. Ohio Barge Line, Inc.,* 742 F.2d 202, 206 (5th Cir.1984) (failure to object to absence of separate interrogatories at trial precludes raising the issue on appeal). Although in egregious circumstances acquiescence in erroneous instructions may not be immune from remedy, *see Fruge v. Penrod Drilling Co.,* 918 F.2d 1163, 1169 (5th Cir.1990) ("Plain error requires that plaintiff establish the challenged instruction was an incorrect statement of the law and was probably responsible for an incorrect verdict, leading to substantial injustice."); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1364, 220 USPQ 763, 774 (Fed.Cir. 1984), in this case the instructions were not in error. Thus there is no basis for BP's objection now raised.

■■■ BP also argues that the issue of equivalency should not have been given to the jury because Celanese did not present sufficient evidence of equivalency. Celanese states that this purported insufficiency of the evidence was not raised at trial, either by motion for directed verdict or by request for jury instruction or in any other way before the case went to the jury. A party may not challenge a verdict in a post-trial motion for

judgment as a matter of law absent a properly made motion for a directed verdict at the close of all the evidence. Fed.R.Civ.P. 50(b); *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1227–28 (5th Cir.1988) ("[A] party may only base a motion for judgment notwithstanding the verdict on a ground that he included in a prior motion for directed verdict at the close of all the evidence.") (collecting cases); *Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 412, 25 USPQ2d 1447, 1449 (Fed.Cir.1993) (interpreting Fifth Circuit law).

BP's directed verdict motion did not address the issue of equivalency or the sufficiency of the evidence to show equivalency, BP arguing only that there was no infringement of the "stable" limitation based on the "dimension" definition. BP argued in its motion for judgment as a matter of law that Celanese's electron micrographic evidence, showing a macroreticulated structure for both Amberlyst® 15 (used by Celanese) and Purolite® (used by BP) resin, was not sufficient to prove similarity of the "way" the resin worked. Celanese states that BP's silence or inadequate objection, in its directed verdict motion, to the now-asserted deficiency in Celanese's proofs, deprived Celanese of the opportunity to cure any such deficiency before the case was submitted to the jury.

Providing the opportunity to the nonmovant to repair gaps in its proofs is the reason Rule 50(b) is rigorously applied. *See generally Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947) (discussing the opportunities pursuant to Rule 50(b) for litigants and trial judge to correct errors before appeal is taken). BP disputes Celanese's view of the content of BP's motions, stating that it moved and filed a supporting memorandum for directed verdict after plaintiff's case and at the close of the evidence, pointing out the inadequacies of the evidence. Our review of BP's memorandum in support of its motion for directed verdict detects no mention of the doctrine of equivalents; the memorandum focuses entirely on the meaning of "stable."

As we have discussed, on the correct claim interpretation the claims are literally infringed. This jury's verdict of infringement is consistent with our ruling based on claim interpretation. In addition, the district court reviewed the evidence, referred to the insubstantial nature of BP's variation of the patented process, and stated that the verdict of infringement was "overwhelmingly supported by the evidence." On review of the entirety of the proceeding, we have not been shown grounds for reversal or for a new trial. *See Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 225 USPQ 634 (Fed. Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

## E. BP's Separate Patent on its Process

 BP directs our attention to its "Jones patent," U.S. Patent No. 5,003,104, and asks that we take judicial notice that BP is practicing a process that is separately patentable, arguing that this is presumptive evidence of non-infringement.

BP's Jones patent was not introduced at trial, Celanese says intentionally because it showed that the Purolite® resin used by BP was "likely macroreticulated," an issue that was contested at trial although not on appeal. As the district court remarked, a reasonable jury could have discredited the BP tests wherein the pores of the resin were first collapsed by high heat or a drying process, evidence that the district court called "extremely dubious." Although there is much argument on this point on appeal, we decline to consider disputed evidence that could have been but was not offered at trial. Indeed, the proposition for which it is offered is incorrect. *See Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1580, 224 USPQ 409, 417 (Fed.Cir.1984) (an improvement in a step of a patented method, even if separately patentable, may not avoid infringement). *See also National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192, 37 USPQ2d 1685, 1689 (Fed.Cir.1996) (the fact of separate patentability is relevant and should be weighed, but is not dispositive of noninfringement).

The fact of separate patentability presents no legal or evidentiary presumption of noninfringement and, in this case, does not outweigh the substantial evidence supporting the jury verdict of infringement.

## Conclusion

On the correct interpretation of "stable" as measured by linear dimension, the claims read on the accused method. Alternatively, there was substantial evidence whereby a reasonable jury could have found infringement. The judgment of infringement is affirmed.

## II

### WILLFUL INFRINGEMENT

BP argues that the jury verdict of willful infringement should be reversed, asserting that the question of infringement was a close one, and thus can not be deemed willful as a matter of law.

 The issue of willfulness of wrongdoing is a question of fact, and was presented to the jury for decision. On appellate review of the jury verdict, if there was substantial evidence in support of the verdict it is not subject to reversal on appeal. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1581, 1 USPQ2d 1081, 1091 (Fed. Cir.1986).

 The issue of "willful" infringement measures the infringing behavior, in the circumstances in which the infringer acted, against an objective standard of reasonable commercial behavior in the same circumstances. Willful infringement is thus a measure of reasonable commercial behavior in the context of the tort of patent infringement. The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement and the enhancement of damages. *Amsted Indus. Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 181, 30 USPQ2d 1462, 1464 (Fed.Cir. 1994). *See American Medical Sys., Inc. v. Medical Eng. Corp.,* 6 F.3d 1523, 1531, 28 USPQ2d 1321, 1326 (Fed.Cir.1993) (determining whether infringer had a "reasonable good faith belief" in noninfringement); *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1581, 12 USPQ2d 1026, 1032 (Fed. Cir.1989) ("copying is evidence of willful infringement"), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990).

The jury was instructed as follows:

Willful infringement is established where Celanese has proven that BP and Sterling (i) were aware of Celanese's patent; and (ii) had no reasonable basis for reaching a good faith conclusion that using their method avoided infringement of the patent. Infringement is not willful and deliberate if the party found to be infringing had a reasonable basis to believe that the patent is invalid or not infringed.

You may find that BP and Sterling willfully infringed the '806 patent if you find, by clear and convincing evidence, that BP and Sterling failed to exercise due care to determine whether or not they were infringing the patent, after they had actual notice of the patent.

BP does not assert error in the instruction, and we discern none. However, BP argues that the verdict is not supported by substantial evidence, pointing to its own evidence and the comments by the trial judge that the case was a close one. *See Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 10 USPQ2d 1338 (Fed.Cir.1989) (reviewing to determine whether jury verdict is supported by substantial evidence on the record as a whole), *overruled as to laches, A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1038, 22 USPQ2d 1321, 1333 (Fed.Cir. 1992) (*en banc* ).

 There was evidence that BP conducted research in an effort to avoid the Celanese process, and that BP turned to the process that was found to be infringing only after failing to find some other solution to the problem of iodide contamination. BP argues that infringement that is not literal, but is found only by equivalency, can not be willful for it shows BP's good faith effort to avoid the patent. Such facts when present are of course relevant, but it is not a rule of law that infringement that is not literal can never be sufficiently culpable to warrant enhanced damages. Although avoidance of literal infringement is a fact to be considered and weighed, along with other.relevant facts, it is not an automatic exculpation. And in this

case, as we have discussed, the infringement is literal.

BP requested reexamination of the Celanese patent six months before trial. The district court declined to stay the trial, and the proceedings went forward concurrently. This procedure was fully within the court's discretion, lest the trial schedule be manipulated or unduly delayed. However, BP also argues that the acceptance by the patent examiner of the reexamination request was evidence of the closeness of the question and supports the position that infringement was not willful.

▪ We take notice that the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met (*i.e.*, that a "substantial new question of patentability" has been raised, 35 U.S.C. § 303), does not establish a likelihood of patent invalidity.[2] *See Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942, 18 USPQ2d 1707, 1710 (Fed. Cir.) ("initial rejection by the Patent and Trademark Office of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims"), *cert. denied*, 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991).

The issue of willful infringement was thoroughly argued to the jury, whose determination must be upheld if any set of facts supported by substantial evidence is capable of sustaining the verdict. *Orthokinetics*, 806 F.2d at 1580, 1 USPQ2d at 1091. Although we do not know whether the jury's finding of infringement was based on literal infringement or on equivalency, on the entirety of

the record there was substantial evidence whereby a reasonable jury could have found willfulness. The verdict must be sustained.

## III

## SANCTIONS

Celanese asserts that BP's appeal is frivolous, and requests the imposition of sanctions.

▪ BP's appeal was taken as of right, on disputed and technologically complex facts. Although a jury verdict warrants deference on appeal, in light of this court's conflicting holdings, now resolved in *Markman*, that issues of claim interpretation in infringement actions must be decided *de novo* on appeal, a losing party having a colorable argument can not be faulted for seeking appellate attention after a jury trial. Although we have affirmed the district court's judgment, BP's arguments on the merits are clearly not frivolous. Unwarranted accusations of frivolousness, and the satellite litigation generated by unsupported requests for sanctions, are no less burdensome to the court and the parties than are authentically frivolous appeals.

### *Costs*

No costs.

*AFFIRMED.*

---

**2.** The Annual Report of the Patent and Trademark Office for 1994 states that 89% of the reexamination requests were granted that year, but only 5.6% of the reexamined patents were completely rejected with no claims remaining after reexamination.